**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DONALD KERR,**

<table>
<tr><td></td><td>**Plaintiff,**</td><td></td></tr>
<tr><td>**vs.**</td><td></td><td>**1:12-CV-1392**<br>**(MAD/CFH)**</td></tr>
<tr><td>**JOSEPH A. SNYDER,** *et al.*,</td><td></td><td></td></tr>
<tr><td></td><td>**Defendants.**</td><td></td></tr>
</table>

_____

**APPEARANCES:**                                      **OF COUNSEL:**

**SUSSMAN, WATKINS LAW FIRM**          **MICHAEL H. SUSSMAN, ESQ.**
55 Main Street, Suite 6
Post Office Box 1005
Goshen, New York 10924
Attorneys for Plaintiff

**COOKER, NETTER LAW FIRM**              **ERIC M. KURTZ, ESQ.**
85 Main Street
Post Office Box 3939
Kingston, New York 12402
Attorneys for Defendants
Snyder, Butler, and Lucchesi

**OFFICE OF UNITED STATES**              **KAREN FOLSTER LESPERANCE, ESQ.**
**ATTORNEY - ALBANY**
James T. Foley U.S. Courthouse
445 Broadway, Room 218
Albany, New York 12207-2924
Attorneys for Defendants
Morrison and Moriarty


**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On September 11, 2012, Plaintiff Donald Kerr commenced this action pursuant to 42

U.S.C. §§ 1983 and 1988. *See* Dkt. No. 1. Plaintiff claims that Defendants Snyder, Lucchesi,

Butler, Morrison and Moriarty violated his constitutional right to be free from search, seizure and detention without reasonable suspicion or arguable probable cause.[1]  *Id.* at 2.

Currently before the Court are Defendants' motions for summary judgment, which Plaintiff opposes.  Dkt. Nos. 41, 42.

## II. BACKGROUND

### A.    Factual Background

In October 2011, Defendant Morrison, a United States Postal Inspector, identified a parcel with "a number of characteristics which raised a reasonable suspicion that the package contained narcotics."  Dkt. No. 42-2 at 1.  Defendant Morrison arranged a controlled delivery of the package with the assistance of the New Paltz Police Department.  *Id.*  The package was accepted by an individual at the location it was addressed to, and the individual "signed for and took possession of the package, [after which] he was detained by members of the New Paltz Police department."  *Id.* at 2.  Police officers asked for his consent to search the package, which he refused.  *See id.*  At this point, the New Paltz K-9 unit was called and the canine alerted to the presence of narcotics in the package.  *See id.*  Thereafter, the police obtained a search warrant for the package, which was then opened at the New Paltz police department, and found to contain eight bags of a leafy green substance which tested positive for marijuana.  *See id.*  "The individual who accepted the package was arrested and later pled guilty to possession of a controlled substance."  *Id.*

Subsequent to this event, Defendant Morrison started an investigation into the area of California from where the package was sent, "an area . . . considered[ed] to be a 'source city' for narcotics."  *Id.*  A number of suspicious packages sent from this area to New Paltz all shared a

_____

[1] On March 7, 2013, Plaintiff filed an amended complaint identifying Defendants Morrison and Moriarty, both of whom had been listed as John Doe defendants in the original complaint.  *See* Dkt. No. 12.

number of similar characteristics, including: (1) they were all sent by express mail, (2) the packages were heavy, (3) all the packages cost over thirty five dollars in postage, with a maximum known amount of one hundred and thirty five dollars, (4) some of the packages had sequential label numbers, "which can indicate that the labels were likely taken in a stack from a single post office . . ., but they were mailed from different post offices[,]" and (5) "[i]n most instances the sender and the recipient had the same last name." *Id.* at 3. Defendant Morrison "recognized these characteristics [as] commonly seen in packages containing narcotics." *Id.* Defendant Morrison put in place a "parcel watch" on several New Paltz addresses that had received more than one package with these suspicious characteristics. *Id.*

183 Main Street, New Paltz, New York, was one of the addresses that had been placed on parcel watch because "Defendant Morrison's investigation revealed [that] two prior suspicious packages . . . had been delivered to that address." *Id.*[2] At some point after the implementation of the parcel watch, the New Paltz Postmaster contacted Defendant Morrison about a package with characteristics that indicated it contained narcotics that was addressed to 183 Main Street. *Id.* at 4. Although there is a dispute regarding the exact dates of these events, it is known that Defendant Morrison received a call from the New Paltz Postmaster, following which he contacted Defendant Lucchesi about coordinating a controlled delivery of the package. *See id.*

---

[2] Although Plaintiff denies that Defendant Morrison's investigation revealed two prior suspicious packages, it is not clear how Plaintiff's clarification changes Defendants' narrative. Dkt. No. 25 at 2. Plaintiff claims that Defendant "Morrison had not seen any prior suspicious parcels addressed to this location[,]" seeming to place emphasis on the visual aspect of "seeing" the packages. *Id.* (Dkt. No. 42-17 at 16). However, all the information needed to identify suspicious packages is available in electronic form in the Post Office internal database. Dkt. No. 42-17 at 25 (according to Defendant Morrison's deposition, he was able to use tracking numbers to look at the mailing label of the relevant packages, without actually "seeing" any of the packages). Therefore, whether Defendant Morrison physically saw the packages is not relevant to the Court's analysis.

Sometime after Defendant Morrison contacted Defendant Lucchesi, Defendant Lucchesi "drove by 183 Main Street a few times, and ascertained that there were two business offices on the first floor – one occupied by Mr. Kerr and the other by a Laurie DellaVilla – and an apartment upstairs." *Id.* at 5. On November 4, 2011, Defendant Morrison called Defendant Moriarty, a colleague postal inspector, to ask "for his assistance in making a controlled delivery, which [Defendant Moriarty] agreed to provide." *Id.* On the same morning, Defendant Morrison traveled to the New Paltz Post Office where he retrieved the package, and then traveled to the New Paltz police department,"where he met with Detective Lucchesi and Sergeant Butler, and waited for [Defendant] Moriarty to arrive." *Id.* The package fit the suspicious characteristics that Defendant Morrison had previously observed in narcotics packages, including that it was sent via express mail with a postage cost of one hundred twenty-seven dollars and sixty cents, the label number was in sequential order with the previous package delivered to 183 Main Street, the sender and recipient had the same last name, and the package was excessively taped around the edges, something that "[i]n [Defendant] Morrison's experience . . . was commonly done with packages containing marijuana in order to mask the odor." *Id.* at 5. Defendants Morrison and Lucchesi conducted searches of law enforcement databases, and based on these searches determined that the return address on the package did not exist, nor was anyone with the sender's name "in or near Weaverville, California[,]" the city listed in the return address on the package. *Id.* at 6.[3] Additionally, Defendant Lucchesi could find no record of Shaun Webber, the package's

---

[3] Plaintiff claims that Defendant Morrison "did . . . not conclusively determine" that the sender's address did not exist, but the deposition that he cites to does not support his argument. Dkt. No. 45 at 4; *see* Dkt. No. 42-17 at 34-36. The portion of the deposition Plaintiff cites discussed searches run on 183 Main Street, not a search run on the sender's return address. In any event, it is not disputed that Defendant Morrison could not verify that the return address on the package existed.

addressee, in New Paltz law enforcement databases. Dkt. No. 42-2 at 7. Based on the above facts, Defendant "Morrison was highly suspicious that the package contained narcotics, and determined to proceed with the controlled delivery." *Id.*

Defendant "Morrison changed into a postal carrier uniform and retrieved a postal 'long life vehicle' (a standard mail delivery truck . . . ) from the New Paltz Post Office." *Id.* "He then placed the package in the front of the postal vehicle and waited to be notified that [the rest of the Defendants were] in position at 183 Main Street, and then proceeded to that address." *Id.* at 8. Defendant Moriarty waited in front of 183 Main Street, and Defendants Snyder, Lucchesi and Butler were all parked out of eyesight of the controlled delivery. *Id.*; Dkt. No. 41-1 at 3. Defendant Morrison, who had "an open cell phone call with [Defendant] Snyder so that he and [Defendant] Lucchesi could hear what was going on[,]" pulled into the parking lot at the same time as a red Saab that contained Plaintiff. Dkt. No. 42-2 at 8. The details of what occurred at this point are disputed, but all parties agree that Plaintiff asked Defendant Morrison if there was "anything for Kerr[,]" and Plaintiff subsequently signed for and accepted possession of the package, stating that he believed that the package identified the recipient as "one of the students who lives upstairs." Dkt. No. 45 at 7; Dkt. No. 42-2 at 9. Thereafter, Plaintiff walked toward the building, where Plaintiff contends that he intended to place the box at the entrance to the upstairs apartment, which is separate from the entrance to Plaintiff's portion of the building.

At this point, Defendant Moriarty "saw [Plaintiff] take the box from [Defendant] Morrison, and alerted the nearby [Defendants] via handheld radio." Dkt. No. 42-2 at 9. As Plaintiff "approached the front porch of the building at 183 Main Street, [Defendant] Moriarty confronted him, stating 'Federal Agent, put the box down.'" *Id.* In response, Plaintiff stated "it's not my box." *Id.* Defendant Moriarty repeated his demand, and Plaintiff complied, putting down

both the package and a laptop bag that he was carrying.  *Id.* at 10.  At that point, Defendant

Moriarty handcuffed Plaintiff.[4]  *Id.*  Subsequently, Defendants Snyder, Lucchesi, and Butler

arrived and took custody of Plaintiff.[5]  After handcuffing Plaintiff and relinquishing custody,

Defendant Moriarty was no longer involved in the investigation.  Dkt. No. 42-2 at 11.

Defendants' statements of fact diverge at this point, as Defendants Snyder, Lucchesi, and

Butler (the "New Paltz Defendants") claim that they did not know that Plaintiff was "the subject

of the investigation, nor were they aware that [Plaintiff] would eventually sign for the package."

Dkt. No. 41-1 at 5.  In contrast, Defendants Morrison and Moriarty (the "Federal Defendants")

claim that both sets of Defendants had discussed Plaintiff before initiating the controlled delivery,

including that Plaintiff was "googled" prior to the delivery, that a photo of Plaintiff was shown on

the computer at the New Paltz police station, and the Federal Defendants "learned from one of the

New Paltz police officers that one of the individuals who had an office at 183 Main Street,

[Plaintiff], had prior arrests on drug offenses."  Dkt. No. 42-2 at 6.  Plaintiff denies the Federal

Defendants' version of events insofar as the Federal Defendants claim Plaintiff was specifically

discussed prior to the controlled delivery.  Dkt. No. 45 at 5.

After the New Paltz Defendants took custody of Plaintiff, Plaintiff "asked if they could

move inside his office, so that he was not handcuffed on his front porch on Main Street, and

[Defendant] Butler complied."  Dkt. No. 42-2 at 10.  Once Defendant "Butler brought [Plaintiff]

---

[4]  Plaintiff contends that Defendant Moriarty's use of handcuffs was to arrest Plaintiff "if
the package contained marijuana[,]" while Defendants contend that the use of handcuffs were "for
[Defendant Moriarty's] own safety concerns, because at the time he was the only law enforcement
officer present."  Dkt. No. 45 at 7; Dkt. No. 42-2 at 10.

[5]  Plaintiff denies this statement, but his denial is limited to the time frame in which the
officers arrived.  Plaintiff contends that Defendants Snyder, Lucchesi, and Butler "arrived almost
instantaneously[,]" while Defendants claim that the officers arrived "within moments."  Dkt. No.
45 at 7; Dkt. No. 42-2 at 10.

inside his office, the New Paltz K-9 unit arrived and examined the package, which was still on the front porch[,]" and "the K-9 alerted to the presence of narcotics in the package." *Id.* at 11. When asked to consent to a search of the package, Plaintiff stated that the package did not belong to him, and therefore he could not consent to a search. *Id.* at 12. However, Defendants obtained and executed a search warrant and found that the package contained "eight clear vacuum sealed bags containing a leafy green substance, which field tested positive for marijuana." *Id.* Based on the search of the package, Plaintiff was "formally charged with criminal possession of marijuana, second degree." *Id.* Pursuant to the search warrant, Plaintiff's laptop was confiscated because it "may have contain[ed] relevant evidence concerning the possession of marijuana." Dkt. No. 41-1 at 6. The laptop was given to the New York State Police Crime Lab for forensic analysis. *Id.*

Plaintiff's state court criminal case went before a grand jury, which issued a no true bill on April 12, 2012. Dkt. No. 44 at 28. Plaintiff eventually retrieved his computer when he went to the New Paltz police department where he "demanded his computer and received it seven weeks after the no true bill was entered." *Id.* at 29.

## B.      The Federal Defendants' summary judgment motion

The Federal Defendants claim that Defendant Moriarty instituted an investigative detention when he initially handcuffed Plaintiff, and that an investigative detention is warranted if an officer has a reasonable suspicion that criminal activity occurred. Dkt. No. 42-1 at 17. According to the Federal Defendants, Defendant Moriarty's intention was "only to detain [Plaintiff] long enough for the K-9 unit to examine the box for the possible presence of narcotics." *Id.* at 19. Further, Defendant Moriarty's use of handcuffs was for safety, because Defendant Moriarty was "the only officer present at that time." *Id.* Additionally, the Federal Defendants argue that based on "the brief and non-intrusive nature of the overall encounter between

[Defendant] Moriarty and [Plaintiff], the mere fact that [Plaintiff] was placed in handcuffs, standing alone, is insufficient to render the detention a *de facto* arrest." *Id.* at 20.

The Federal Defendants argue that summary judgment is appropriate because Defendant Moriarty's initial detention was conducted according to reasonable suspicion, and there was probable cause to arrest once the canine alerted on the package, indicating the presence of narcotics. *See id.* at 20, 22. They further claim that even if the Court were to find that Plaintiff's detention converted to an arrest before the package was actually opened, probable cause to arrest existed at all times after the canine alerted on the package. *Id.* at 22.

The Federal Defendants also allege that they had no personal involvement in the incident past the initial detention and, therefore, they may not be held liable for Plaintiff's detention in his office, for any alleged unlawful detainment that occurred while Plaintiff was handcuffed to a bench at the New Paltz police station prior to being formally charged, or for any unlawful seizure of property that occurred due to the seizure of Plaintiff's laptop. *See id.* at 24. However, if the Court finds that there was personal involvement, the Federal Defendants contend that seizure of the laptop was pursuant to a valid search warrant, and "[w]here, as here, property is seized pursuant to a search warrant issued upon probable cause, there is no violation of the Fourth Amendment." *Id.* at 25.

Alternatively, if the Court finds that the Federal Defendants did violate Plaintiff's constitutional rights, they contend that both Defendant Morrison and Defendant Moriarty are entitled to qualified immunity. *See id.* at 27. The Federal Defendants argue that, even if the Court finds that they are not entitled to summary judgment as to Plaintiff's alleged unlawful detention and arrest, they are entitled to qualified immunity because they had reasonable suspicion to believe that Plaintiff was engaged in criminal activity both before and after the K-9

alerted to the presence of narcotics. *See id.* at 27-28. As to the alleged unlawful seizure of

Plaintiff's laptop, the Federal Defendants assert that "'the issuance of a search warrant (which

depends, of course, on a finding of probable cause) creates a presumption that it was objectively

reasonable for the officers to believe that the search was supported by probable cause.'" *Id.* at 28

(quoting *Martinez v. City of Schenectady*, 115 F.3d 111, 115 (2d Cir. 1997)) (other citations

omitted).

**C.      The New Paltz Defendants' summary judgment motion**

First, the New Paltz Defendants argue that, even if there was a false arrest, since they were

not present at the time of the alleged false arrest, liability will only extend if they "had reason to

know" a false arrest was likely to occur. Dkt. No. 41-9 at 4. Additionally, the New Paltz

Defendants contend that probable cause existed and, therefore, there is no cause of action for false

arrest. They argue that because Plaintiff signed for the package even though he knew it was not

addressed to him, and because Defendants knew the addressee had no connection to 183 Main

Street, "it was certainly reasonable for the defendants to believe that the plaintiff was expecting

the package." *Id.* at 6. In the alternative, the New Paltz Defendants argue that they are entitled to

qualified immunity, because "at the very least, 'arguable probable cause' for plaintiff's arrest

existed, and therefore, any claim for false arrest is barred." *Id.* at 9.

Additionally, the New Paltz Defendants contend that they did not violate Plaintiff's

constitutional rights by seizing his laptop because "the evidence is clear that the laptop was seized

pursuant to [a] valid search warrant, as it may [have] contain[ed] relevant evidence for the

prosecution of the pending criminal action." *Id.* at 11. Further, the New Paltz Defendants assert

that they were entitled to retain the laptop until the disposition of the pending criminal case. *See*

*id.* They contend that, upon disposition of the criminal case, Plaintiff sent an email to Defendant

Snyder requesting the return of his laptop, which was returned to Plaintiff approximately one (1) week after the email was sent. *See id.*

**D.    Plaintiff's opposition**

In his opposition, Plaintiff argues that "a reasonable jury could here conclude that the defendants all planned the arrest strategy together and all decided in advance that anyone who accepted the package, whatever the circumstances, would be detained." Dkt. No. 46 at 8. Based on this group action, Plaintiff alleges that "a jury could believe . . . [that] none of the members of law enforcement who participated in the arrest discussed in advance anything about Kerr or his history" and, therefore, all Defendants may be held liable for Plaintiff's false arrest claim. *Id.* at 10.

In further support of his false arrest claim, Plaintiff argues that no probable cause existed to arrest him because Defendants "did not allow probable cause to develop" when they arrested Plaintiff before his intentions regarding the package were clear. *Id.* at 11-12. According to Plaintiff, "[i]t was not clear at the time of [Plaintiff's] arrest whether he intended, as he stated, to accept the package for [the addressee] and deliver it to the area where he believed [the addressee] would retrieve it or [whether he would] . . . keep it for himself." *Id.* at 12. Therefore, Plaintiff claims that Defendants "had no basis to associate plaintiff with the package other than his having tak[en] control of it and he did that expressly indicating that he was doing so for another." *Id.* at 13.

Plaintiff also opposes summary judgment based on the unreasonable seizure and retention of his laptop, because he "sought the return of his laptop [through counsel]. But, the New Paltz defendants were unresponsive and retained hi[s] computer without any basis for another seven

weeks." *Id.* at 15. Further, Plaintiff alleges that Defendants' seizure of the laptop had no legal basis because Defendants had no probable cause for the arrest. *Id.*

Plaintiff argues that qualified immunity is inappropriate in this case, but seems to have inserted language from a brief regarding qualified immunity in an equal protection context. *Id.* at 21-23. In the limited arguments relevant to this case, Plaintiff contends that the right to be free from arrest absent probable cause was clearly established as of November 4, 2011. *See id.* at 23. Additionally, Plaintiff contends that "the dog 'alert' adds nothing to the case because it does not link [Plaintiff] in any way to this package for which he was arrested. Simply stated, on the facts known to them, there was no 'substantial chance' that Kerr was engaged in criminal behavior when they arrested him." *Id.* at 23-24 (citing *United States v. Bakhiari*, 913 F.2d 1053, 1062 (2d Cir. 1990)).

## III. DISCUSSION

### A.  **Standard of review**

#### *1. Summary judgment*

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

### 2. 42 U.S.C. § 1983

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481, *reh. denied*, 445 U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980)). As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)) (other citation omitted).

However, "[w]here a plaintiff brings a Section 1983 claim against federal defendants in error, the proper course of action is to construe the complaint as stating a cause of action under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), which is the federal analog to Section 1983 claims." *Bordeaux v. Lynch*, 958 F. Supp. 77, 84 (N.D.N.Y. 1997).

### 3. *Levels of government and private citizen interaction*

"[T]here are three levels of interaction between agents of the government and private citizens. . . . Consensual encounters require no justification so 'long as the police do not convey a message that compliance with their requests is required.' . . . Investigative detentions, the second category, require 'reasonable suspicion' to believe that criminal activity has occurred or is about to occur." *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995) (quotations and other citations omitted). "Arrests, requiring a showing of probable cause, comprise the third type of encounter between citizens and government agents." *Id.*

Additionally,

> "[a] permissible investigative stop may become an unlawful arrest if the means of detention are 'more intrusive than necessary.'" . . . "In determining whether an investigatory stop is sufficiently intrusive to ripen into a *de facto* arrest, the Second Circuit considers the 'amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.'"

*United States v. Wiggan*, 530 Fed. Appx. 51, 55 (2d Cir. 2013) (internal quotations and citations omitted). "Whether a seizure is an arrest or merely an investigatory detention, depends on the reasonableness of the level of intrusion under the totality of the circumstances." *Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991) (citations omitted). Additionally, to determine whether the length

of an investigatory detention is reasonable, courts will consider if "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *U.S. v. Sharpe*, 470 U.S. 675, 686 (1985) (citations omitted).

## B.    False Arrest

"Claims for false arrest, whether brought under § 1983, pursuant to *Bivens*, or under state law, are analyzed pursuant to the same standards as the applicable state law's false arrest tort." *Nzegwu v. Friedman*, ___ Fed. Appx. ___, 2015 WL 1449647, *1 (2d Cir. 2015) (citing *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003)).  Under New York law, "to prevail on a claim of false arrest a plaintiff must show that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Jocks*, 316 F.3d at 134-35 (internal quotation marks omitted).  If an officer has probable cause to arrest, the confinement is privileged. *See id.* at 135.

According to the Second Circuit,

> [t]he Supreme Court has repeatedly stated that the probable-cause standard is "a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983).  Because the standard is fluid and contextual, a court must examine the totality of the circumstances of a given arrest. *Id.* at 371; *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).  These circumstances must be considered from the perspective of a reasonable police officer in light of his training and experience. *United States v. Moreno*, 897 F.2d 26, 31 (2d Cir. 1990), *abrogated on other grounds by Horton v. California*, 496 U.S. 128, 110 (1990).

*United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008).  However, "no probable cause exists to arrest where a suspect's actions are too ambiguous to raise more than a generalized

suspicion of involvement in criminal activity." *United States v. Valentine*, 539 F.3d 88, 94 (2d Cir. 2008).

"For an investigatory detention to be justified at its inception, the officer must be able to 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrants that intrusion.'" *United States v. Restrepo*, 890 F. Supp. 180, 193 (E.D.N.Y. 1995) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Defendant Morrison relied on his past experience when he placed a parcel watch on 183 Main Street, based on a number of characteristics that he previously found in packages that contained narcotics. Dkt. No. 42-2 at 3. Further, as set out in the statements of fact, Defendant Morrison had participated in at least one almost identical operation to the one currently before the Court, which ended in the successful prosecution of the individual who accepted the package. *Id.* at 1. The only difference between that scenario and the one currently before the Court is that Plaintiff claims that he did not accept the package for himself, but said that he thought the package was for someone else who lived at 183 Main Street. *Id.* at 9. However, Plaintiff still signed for and accepted possession of the package, regardless of what he intended to do with it once it was in his possession. Accordingly, the Court finds that Defendant Moriarty's initial apprehension of Plaintiff was a valid investigatory detention, because Plaintiff's acceptance of the package created a reasonable suspicion that he was involved in criminal activity.

Next, the Court must decide if Defendant Moriarty's investigatory detention became an unlawful arrest before probable cause existed to arrest Plaintiff. "The [investigatory] detention must be 'temporary and last no longer than is necessary to effectuate the purpose of the stop.'" *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). According to the undisputed facts, Defendant Morrison was the only individual present with Plaintiff at the time of the initial

detention, and the New Paltz Defendants almost immediately took custody of Plaintiff, who upon his request, was moved to his office. *See* Dkt. No. 42-2 at 10. The period of time between Plaintiff's initial detention and the canine alert on the package was only nine minutes. *Id.* Accordingly, Defendants' detention of Plaintiff was no longer than required to have the police canine inspect the package. Further, Defendant Moriarty did not use a weapon, search Plaintiff, or do anything more than handcuff him. *See id.* While "[h]andcuffs are generally recognized as a hallmark of a formal arrest[,]" *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (citation omitted), "[i]f there is a basis to detain a suspect, the detention does not become an arrest simply because the suspect[ is] handcuffed." *Oliveira v. Mayer*, 23 F.3d 642, 651 (2d Cir. 1994) (Mahoney, J., dissenting) (citing *Dempsey v. Town of Brighton*, 749 F. Supp. 1215, 1223 (W.D.N.Y. 1990)).

Further, all other factors that the Court considers to determine whether an investigatory detention became an unlawful arrest weigh against a finding that Plaintiff was under arrest prior to the inspection by the K-9 unit. "'In determining whether an investigatory stop is sufficiently intrusive to ripen into a de facto arrest, the Second Circuit considers the amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.'" *Wiggan*, 530 Fed. Appx. at 55 (quoting *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004)) (other quotation omitted).

In the present matter, no force was used and Defendant Moriarty simply ordered Plaintiff to put the box down. *See* Dkt. No. 42-2 at 9-10. While Plaintiff's freedom of movement was restrained, the officers brought in a police canine in under ten minutes to conduct a sniff test "to

confirm or dispel their suspicions" that the package Plaintiff had taken possession of contained narcotics. *See United States v. Sharpe*, 470 U.S. at 686. Further, Defendant Moriarty was the only officer present on the scene when Plaintiff was first handcuffed. *See* Dkt. No. 42-2 at 11. Although the New Paltz Defendants subsequently took custody of Plaintiff, Defendant Butler was left alone with Plaintiff while the other officials conducted their investigation. *See* Dkt. No. 42-2 at 11. Additionally, Plaintiff has not alleged that he was mistreated while in any Defendants' custody; in fact, Defendant Butler allowed Plaintiff to move inside his office so that Plaintiff would not be seen handcuffed on his front porch on Main Street. *See* Dkt. No. 42-2 at 10; Dkt. No. 45 at 8; Dkt. No. 41-3 at 74-75. Further, during the time that Plaintiff was in his office, he requested an opportunity to take some medication, which was granted. *See* Dkt. No. 41-1 at 5. As no factor except the handcuffs signifies that Plaintiff was under arrest, Defendants' investigatory detention of Plaintiff was not more intrusive than necessary and, therefore, did not become a *de facto* arrest. *See Wiggan*, 530 Fed. Appx. at 55; *see also United States v. Shelby*, 954 F.2d 728, 728 (9th Cir. 1992) (holding that the fact that the defendant was handcuffed and moved into an office at the airport while awaiting a canine to inspect the package did not turn the investigatory detention into an arrest) (citations omitted); *Florida v. Royer*, 460 U.S. 491, 506 n.10 (1983) (plurality opinion) ("[T]he officers, with founded suspicion, could have detained Royer for the brief period during which Florida authorities at busy airports seem able to carry out the dog-sniffing procedure").

Finally, the Court must decide if Defendants had probable cause to arrest Plaintiff. The collective knowledge of Defendants at the time of Plaintiff's initial detention on November 4, 2011 was as follows: (1) this was the third suspicious package sent from a source city in Northern California to 183 Main Street in several weeks, each of the three bearing several characteristics

rendering them suspicious for marijuana; (2) the package was large and heavy, sent by Express Mail at a considerable expense, and was excessively taped along all edges, all common characteristics of a package containing marijuana; (3) while the package bore a sequential express mail label number to a package that had been delivered to 183 Main Street a few weeks prior, the two packages were sent from different cities and from different senders, and were addressed to different names at the same address; (4) the sender address was a fictitious address; (5) the addressee's name had no known association with 183 Main Street, and was not listed in the registry of students at SUNY New Paltz; (6) Plaintiff approached Defendant Morrison, who was undercover as a postal delivery man, as soon as Defendant Morrison arrived at the address, inquiring about a package; (7) Plaintiff stated to Defendant Morrison that he believed the addressee is "one of the people who gets mail here;" and (8) Plaintiff signed for and accepted possession of the package. Considering these facts, Defendants undoubtedly had reasonable suspicion to detain Plaintiff until the K-9 unit could inspect the package. *See United States v. Scarborough*, 128 F.3d 1373 (10th Cir. 1997) ("A combination of seemingly independent innocent factors may create a reasonable suspicion justifying detention for a dog sniff if the factors substantially reflect elements of a suspicious profile"); *United States v. Golson*, 743 F.3d 44 (3d Cir. 2014) (finding that the defendants had reasonable suspicion where the package was mailed from a fictitious and non-deliverable return address, sent from Arizona to Pennsylvania, and addressee not a person known to receive mail at the address listed); *United States v. Huerta*, 655 F.3d 806 (8th Cir. 2011) (finding reasonable suspicion in a case involving an Express Mail package, handwritten label, sent from drug source state, name of sender unrelated to return address, telephone number listed for sender disconnected day after package was mailed, number

in return address was scratched out, mailing zip code different than zip code on return address, destination address a hotel, and heavily taped).

In *Rodriguez v. United States*, ___ U.S. ___, 135 S. Ct. 1609 (2015), the Supreme Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* (citation omitted). Unlike *Rodriguez*, however, the initial approach and detention was based on Defendants' reasonable suspicion regarding the contents of the package. As such, Defendants were permitted to extend the duration of the detention to arrange for a canine unit to inspect the package. *See United States v. Ruiz*, ___ F.3d ___, 2015 WL 2151843, *6-*7 (7th Cir. 2015) (citation omitted).

At this point, Defendants contacted the K-9 unit, which arrived approximately nine (9) minutes after the controlled delivery. Once the police canine alerted to the presence of narcotics in the package, Defendants had probable cause to arrest Plaintiff based on the totality of the circumstances. *See Delossantos*, 536 F.3d at 159 ("[C]ircumstances [that give rise to probable cause] must be considered from the perspective of a reasonable police officer in light of his training and experience") (citation omitted). Defendants carried out at least one almost identical operation to the controlled delivery currently at issue, that ended in the successful prosecution of the individual who accepted possession of the package. Dkt. No. 42-2 at 1-2. Similarly, Plaintiff accepted possession of the package, and the drug detection dog alerted on the package. *See Royer*, 460 U.S. at 505-06 (noting that a positive alert from a dog trained to detect the presence of controlled substances would have provided probable cause to arrest the defendant). Further,

Defendants obtained a search warrant from a state court judge after the canine alerted on the package, indicating that the alert created probable cause for the arrest under state law. *See* Dkt. No. 42-15 at 1. Based on the foregoing, the Court finds that, upon the positive canine alert to the presence of narcotics in the package, Defendants had probable cause to arrest Plaintiff.

As the arrest was based on probable cause, the Court grants summary judgment to Defendants on Plaintiff's false arrest claim. *See Weyant*, 101 F.3d at 852.

## C.      Seizure of Plaintiff's laptop

"The Fourth Amendment states unambiguously that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and *the persons or things to be seized*." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (emphasis in original). Defendants obtained a search warrant that allowed them to search Plaintiff's office for records related to marijuana trafficking or transactions, and any money or items related to marijuana trafficking or transactions. Dkt. No. 42-15 at 1. Further, the affidavit in support of the search warrant specifically requested that the officers be permitted to search and seize any "computer, computer programs, [and] computer data," because they may contain records of any drug transactions. *See id.* at 4. Plaintiff's laptop reasonably may have contained records of any illegal activity regarding marijuana trafficking or transactions and, therefore, Defendants were within the bounds of the search warrant when they seized the laptop. Further, Plaintiff does not argue that the search warrant did not allow for seizure of the laptop, but that Defendants lacked the initial probable cause required for the search warrant and arrest. Dkt. No. 46 at 15. As the Court has already found that probable caused existed for Plaintiff's arrest, this argument is without merit.

Plaintiff's remaining claim is that Defendants "retention [of the laptop] for at least seven weeks following issuance of the no true bill . . . was without any arguable justification." *Id.* However, as the New Paltz Defendants correctly contend, although Plaintiff claims that his counsel contacted the New Paltz police department about the return of his laptop soon after the grand jury issued a no-true bill, "there is no documentary evidence within the record to support [this] claim." Dkt. No. 51 at 8. Rather, the first documented request was an email Plaintiff wrote to Defendant Snyder on May 25, 2012 seeking the return of his laptop. *See* Dkt. No. 41-3 at 205. Six days later, Plaintiff went to the New Paltz police department and was given his laptop. *See* Dkt. No. 41-3 at 204. Accordingly, there is no indication that Defendants withheld Plaintiff's laptop.

Additionally, the Court notes that, pursuant to New York's Criminal Procedure Law, property seized pursuant to a search warrant remains in the control of the issuing judge. *See* N.Y. C.P.L. § 690.55(1). Further, "[a] CPLR article 78 proceeding will properly lie to require the return of property, other than contraband, seized pursuant to a search warrant and held for an unreasonable length of time without the commencement of a criminal action[.]" *Moss v. Spitzer*, 19 A.D.3d 599, 600 (2d Dep't 2005) (citation omitted). Additionally, courts in New York have held that a person in Plaintiff's situation can bring a replevin action seeking the return of property seized pursuant to a warrant. *See Boyle v. Kelley*, 42 N.Y.2d 88, 91 (1977) (citations omitted). Considering that Plaintiff had legal remedies to seek the immediate return of his property and because the property was returned within one week of the first documented demand, it cannot be said that Defendants retained the laptop for an unreasonable amount of time after the conclusion of the criminal proceedings. *See id.*

Based on the foregoing, the Court grants Defendants' motions for summary judgment regarding Plaintiff's claim that they withheld his laptop without probable cause upon the issuance of a no-true bill by the grand jury.

**D.     Qualified Immunity**

In the alternative, the Court also finds that Defendants are entitled to qualified immunity.

Qualified immunity protects government officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (holding that qualified immunity is not merely immunity from damages but also "immunity from suit").  "[T]he salient question [in determining qualified immunity] is whether the state of the law . . . gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  As qualified immunity is an affirmative defense, the burden of pleading it falls on the defendants.  *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (citations omitted); *see also Varrone v. Bilotti*, 123 F.3d 75, 78 (2d Cir. 1997) (holding that the "defendants bear the burden of showing that the challenged act was objectively reasonable") (citation omitted).

The qualified immunity determination consists of two steps, which a court may consider in either order.  *See Seri v. Bochicchio*, 374 Fed. Appx. 114, 116 (2d Cir. 2010) (citation omitted). The first step is to determine "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citations omitted).  Second, the court must determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (citation omitted).

A right is "clearly established" if "[t]he contours of the right . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "To determine whether a right is clearly established, we look to: (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question; and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010) (citing *Schecter v. Comptroller of City of N.Y.*, 79 F.3d 265, 271 (2d Cir. 1996)). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting *Kerman*, 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted); *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quotation omitted).

It has been held that the probable cause standard for false arrest is less stringent on the issue of qualified immunity as only "arguable probable cause" is necessary to support qualified immunity. *See Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause

test was met.'" *Id.* (quotation and other citations omitted). Thus, the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause; 'arguable probable cause' will suffice to confer qualified immunity for the arrest." *Id.*

In regard to Plaintiff's first cause of action, "it is settled that a person has a clearly established right not to be arrested or prosecuted without probable cause." *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993). The Court finds, however, that even if Defendants did not have probable cause to arrest Plaintiff, the undisputed facts clearly establish that Defendants had arguable probable cause. It was objectively reasonable for Defendants to believe that Plaintiff was the intended recipient of the package because the addressee was not associated with the premises in any way and Plaintiff inquired about and then took custody of the suspicious package. Further, Defendant Morrison, with the assistance of the New Paltz Police Department, had previously conducted a controlled delivery involving a near identical package and set of circumstances, which resulted in a narcotics related possession. Accordingly, based on the circumstances of this case, the Court finds that Defendants had arguable probable cause and, therefore, are entitled to qualified immunity as to Plaintiff's false arrest claim.

Plaintiff's second claim, the unreasonable seizure and withholding of Plaintiff's laptop, is similarly subject to dismissal qualified immunity grounds. "[T]he issuance of a search warrant (which depends, of course, on a finding of probable cause) creates a presumption that it was objectively reasonable for the officers to believe that the search was supported by probable cause." *Martinez v. City of Schenectady*, 115 F.3d 111, 115 (2d Cir. 1997). Additionally, as discussed, the laptop was returned to Plaintiff approximately seven weeks after the grand jury returned a no-true bill. Despite Plaintiff's conclusory assertions to the contrary, the only documented request for the return of the computer occurred approximately seven days before it

was returned to Plaintiff.  Further, Plaintiff had formal avenues he could have pursued to seek the return of his property but failed to take advantage of them.  Considering the undisputed facts, the Court finds that reasonable officials in Defendants' position would not have believed that his or her actions were unlawful.

Based on the foregoing, the Court finds that, in the alternative, Defendants are entitled to qualified immunity for their actions; and, therefore, the Court grants Defendants' motion for summary judgment.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motions for summary judgment (Dkt. Nos. 41 and 42) are **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: July 17, 2015
     Albany, New York

Mae A. D'Agostino
U.S. District Judge